## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL JONES,       :
                  :
          Plaintiff     :    No. 3:14-CV-2337
                  :
       vs.        :    (Judge Nealon)
                  :
CAROLYN W. COLVIN, Acting  :
Commissioner of Social Security,  :
                  :
       Defendant   :

**FILED**
**SCRANTON**

MAR 1 7 2016

Per_____
DEPUTY CLERK

### <u>MEMORANDUM</u>

On December 9, 2014, Plaintiff, Michael Jones, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, <u>et seq</u> and U.S.C. § 1381 <u>et seq</u>, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB and SSI will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his application for DIB on February 22, 2011, and his application for SSI on March 4, 2011, alleging disability beginning on January 28, 2011, due to a vision impairment, heart problems, spleen problems, foot problems and "problems with barrings control." (Tr. 205, 209).[4] The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on December 20, 2011. (Tr. 10). On February 22, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 10). An oral hearing was held on March 28, 2013, before administrative law judge Randy Riley ("ALJ"), at which Plaintiff and an impartial vocational expert, Sheryl Bustin, ("VE"), testified. (Tr. 27). On April 16, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing limited sedentary work. (Tr. 7).

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on March 27, 2015. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On May 29, 2013, Plaintiff filed a request for review with the Appeals

Council. (Tr. 6). On October 9, 2014, the Appeals Council concluded that there

was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus,

the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on December 9, 2014. (Doc. 1). On

March 27, 2015, Defendant filed an answer and transcript from the SSA

proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of his complaint

on May 11, 2015. (Doc. 12). Defendant filed a brief in opposition on June 11,

2015. (Doc. 14). Plaintiff filed a reply brief on June 30, 2015. (Doc. 16).

Plaintiff was born in the United States on December 23, 1968, and at all

times relevant to this matter was considered a "younger individual."[6] (Tr. 205).

Plaintiff obtained his GED, and can communicate in English. (Tr. 31, 208). His

employment records indicate that he previously worked as a laborer in a

warehouse, a stocker in a grocery store, and a painter. (Tr. 215). The records of

the SSA reveal that Plaintiff had earnings in the years 1986 through 1992, 1994

---

6. The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work. However, in some circumstances, we consider that persons age 45-
49 are more limited in their ability to adjust to other work than persons who have
not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

through 2002, and 2004 through 2010. (200).  His annual earnings range from a low of no earnings in 1993 and 2003 to a high of eighteen thousand six hundred one dollars and eighty cents ($18,601.80) in 2006.  (Tr. 200).  His total earnings during those twenty-four (24) years were ninety-one thousand five hundred seventy dollars and twenty-two cents ($91,570.22).  (Tr. 200).

In a document entitled "Function Report - Adult" filed with the SSA on March 13, 2011,  Plaintiff indicated that he lived with a friend.  (Tr. 220).  From the time he woke up to the time he went to bed, Plaintiff would go to the bathroom, take his medicine, get help dressing his wounds, get dressed for the day, wait for his food to be served to him, watch television, take a nap, and then prepare for bed.  (Tr. 220).  Before his illnesses, injuries, or conditions, Plaintiff was able to see things, read, get dressed, tie his shoes, cook, drive, and bathe.  (Tr. 221).  He needed help with personal care, including getting dressed, bathing, caring for his hair, shaving, and not walking into objects.  (Tr. 221).  He did not prepare his own meals or perform household chores or yard work.  (Tr. 222).  When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, understanding, following instructions, using hands, or getting along with others.  (Tr. 225).  He was able to walk ten (10) feet before needing to rest for fifteen (15) minutes.  (Tr. 225).  Plaintiff used a

4

cane for walking.  (Tr. 226).

Regarding his concentration and memory, Plaintiff did not need special reminders to take care of his personal needs, but did need special reminders to take his medicine and to attend his appointments.  (Tr. 222, 224).  He could count change, pay bills, handle a savings account and use a checkbook.  (Tr. 223).  He could pay attention for twenty (20) minutes, his mind wondered, he followed written or spoken instructions "good," he was able to finish what he started, and he handled stress and changes in routine well. (Tr. 225-226).  He also noted that since his illnesses, injuries, or conditions began, it was hard to read and concentrate on a task.  (Tr. 224).

Socially, Plaintiff went outside once a week, but could not go out alone or drive because he could not see correctly.  (Tr. 223).  His hobbies included reading, using the computer, and "business," and he was able to do these things "frequently and very well."  (Tr. 224).  He did not have problems getting along with family, friends, neighbors, or others.  (Tr. 225).  He spent time with others at home about two (2) times a week, but did not go anywhere on a regular basis.  (Tr. 224).

Plaintiff also filled out a Supplemental Function Questionnaire for fatigue and pain.  (Tr. 228-230).  His fatigue began when he "left the hospital," was associated with the onset of an illness, remained the same since it began, was

5

worse in the morning and overnight, lasted for two (2) to three (3) hours, and was relieved by sleep. (Tr. 228). He was taking Trazadone, which had an effect on his sleep. (Tr. 228). His pain, located in his chest and stomach, was caused by a motor vehicle accident, started from the time he left the hospital, was sharp and consistent, had not changed in nature since it began, was worsened by walking, bending, and standing, was worse in the morning and overnight, occurred every two (2) hours, lasted for one (1) hour, and caused a change in his eating habits and weight gain. (Tr. 229-230). Plaintiff took Tylenol to relieve his pain, which worked for about twenty (20) minutes, took hot showers, and attended physical therapy. (Tr. 230).

Plaintiff filled out an "Activities of Daily Living" form, which echoed the majority of what he reported in his Adult Function Questionnaire, with the major differences being that he noted he did not read, could not handle his own money or pay bills without assistance, that his only hobby was listening to music, and that he was always lying down . (Tr. 239-245).

At his hearing on March 28, 2013, Plaintiff testified that he lived in an apartment with his brother, and that his highest level of education was seventh grade, but that he obtained his GED. (Tr. 30). He stated that he dressed and showered by himself, but did not cook or grocery shop, do the dishes or laundry,

6

vacuum or sweep, or take out the trash. (Tr. 32). He was not able to drive, and got around with help from family and friends. (Tr. 32). He was unable to bend down to touch his toes or climb ladders, but could climb stairs and walk about half a block before becoming tired and short-winded due to a "trach" in his throat. (Tr. 33). He was able to stand in one position for fifteen (15) to twenty (20) minutes, but would become dizzy, lightheaded, and tired. (Tr. 33). He would nod off when sitting after about fifteen (15) to twenty (20) minutes. (Tr. 33). He lied down all day. (Tr. 34).

He testified that in a typical day, he slept and listened to the radio, but did not watch television because he could not "really keep track of what's going on," did not read because it was hard to concentrate and caused dizziness, and did not use a computer or play video games. (Tr. 34-35). His friends and family would visit him, and they would talk and reminisce. (Tr. 35).

Regarding his impairments, Plaintiff testified that he experienced abdominal pain that was a six (6) on a scale of zero (0) to ten (10), and worsened when he had to use his stomach muscles. (Tr. 36). The pain seemed to be due to sutures that would not dissolve, and he was scheduled for surgery to correct the problem shortly after the hearing. (Tr. 36, 41). He had to lie down all day because the "trach they had put in [his] throat, it must have closed short because [his] oxygen

is just - - I mean, my breathing is - - you know, I'm breathing heavy and I'll run

out of air quick." (Tr. 38).  He took Oxycodone for the pain every six (6) hours.

(Tr. 38).

Since the accident, Plaintiff had difficulty seeing things because it would

take a moment for his eyes to adjust, and he would see snowflakes in his field of

vision of his left eye. (Tr. 39).  He had no peripheral vision in his right eye, and

"the balance between looking through both eyes at the same time, it just makes

everything blurry." (Tr. 39).  These vision issues affected his depth perception,

which has caused him to fall. (Tr. 40).  He did not wear glasses, and stated that he

wanted to go to the eye doctor, but he did not have medical insurance, and could

not afford medical care. (Tr. 40).  He had problems with his short-term memory

since the accident. (Tr. 42-43).

**MEDICAL RECORDS**

On January 29, 2011, Plaintiff presented to the emergency room at

WellSpan Surgical Associates after a motor vehicle accident. (Tr. 307).  It was

noted that Plaintiff went into cardiac arrest before arriving in the trauma bay, and

that he underwent a trauma laparotomy, splenectomy, repair of complex liver

laceration to segments seven (7) and eight (8), a damage control laparotomy with

vacuum-assisted sponge application, a tracheosotomy, a closure of left chest wall

wound, and an insertion of gastrojejunostomy tube.  (Tr. 268, 318).   Plaintiff also underwent a CT scans of his head and all levels of his spine, which all indicated normal results.  (Tr. 258- 262).  Plaintiff was diagnosed with cardiac and respiratory arrest status post motor vehicle accident.  (Tr. 308).  On February 15, 2011, Plaintiff underwent an MRI of the brain, which revealed abnormal serpiginous cortical or leptomeningeal enhancement in the left occipital lobe.  (Tr. 283).  There was no evidence of an acute infarct.  (Tr. 283).  On February 17, 2011, Plaintiff was discharged from the trauma service as stable.  (Tr. 315).

On February 27, 2011, Plaintiff presented to WellSpan again due to complaints of nausea, crampy abdominal pain, and one (1) episode of vomiting. (Tr. 315).  Sachin Vaid, M.D. noted Plaintiff had a mildly distended and mildly tender left lower quadrant and that there was an absence of bowel sounds.  (Tr. 316).  Plaintiff was diagnosed with partial small bowel obstruction versus ileus and possible constipation, and was admitted for observation.  (Tr. 316).  On March 2, 2011, a test revealed tubing coiled in the left upper quadrant that was most likely gastrostomy tubing in the stomach, surgical changes in the left upper quadrant, and significant atelectasis at the right lung base.  (Tr. 291)

On March 4, 2011, Plaintiff was admitted to the emergency department at WellSpan Surgical Associates with a small bowel obstruction versus an ileus. (Tr.

327).  He was treated with a nasogastric tube until his small bowel obstruction improved, at which time the tube was removed. (Tr. 327).  He was discharged after tolerating a full diet.  (Tr. 327).

On March 15, 2011, the doctor noted that since the car accident, Plaintiff had been experiencing a decrease in peripheral vision and depth perception. (Tr. 297).

On March 17, 2011, Plaintiff had a post-surgical follow-up with Ebondo Mpinga, M.D., at WellSpan.  (Tr. 328).  It was noted that since the discharge, Plaintiff had been doing relatively well from an abdominal standpoint, but developed a cough with chest pain.  (Tr. 329).  He requested to have the feeding tube removed as he was not using it, and denied experiencing fever, chills, abdominal pain, nausea, vomiting, or vision problems.  (Tr. 328-330).

On April 13, 2011, Plaintiff underwent a disability determination examination performed by Jessica Ward, D.O. (Tr. 339).  During the examination, Plaintiff stated that "he [was] too weak and ha[d] difficulty walking." (Tr. 339).  He complained of tingling in his toes, ongoing abdominal pain due to the incision and decreased vision in his right eye, including double vision and decreased peripheral vision.  (Tr. 339).  His symptoms included: chest pain; chronic cough, morning cough, and dyspnea on exertion; anorexia, nausea, abdominal pain, and

10

weight loss; myalgias, paresthesias, and tinnitus; and anxiety and depression.  (Tr.

340).  Dr. Ward noted that Plaintiff had intact vision "about 5 degrees to the right

of his nose." (Tr. 341).  Dr. Ward noted Plaintiff had a very slow antalgic gait,

and diagnosed Plaintiff with: status post severe abdominal trauma secondary to

motor vehicle accident; liver and splenic laceration; abdominal pain; right-sided

hemianopsia; blurred vision; neuropathic pain and diffuse weakness.  (Tr. 341-

342).  She recommended ongoing physical therapy. (Tr. 342).  Dr. Ward opined

that Plaintiff could: lift up to twenty (20) pounds occasionally and carry up to ten

(10) pounds occasionally; stand and walk for one (1) hour or less cumulatively in

an 8-hour day; needed a hand-held assistive device for balance and ambulation;

occasionally bend, kneel, stoop, and crouch; and never balance or climb.  (Tr. 344-

345).

On April 21, 2011, Plaintiff was diagnosed with a defect of vision, right

homonymous blindness, chronic constipation, and chronic abdominal pain.

(Tr. 444).

On May 2, 2011, Plaintiff had a neurological consultation with Dr. Jiang,

who noted that Plaintiff' peripheral vision on the right side was absent and that he

has double vision.  (Tr. 354).  Dr. Jiang noted that he was walking with a cane and

stopped driving.  (Tr. 354).  Plaintiff's symptoms included: appetite change,

fatigue/with exertion, blurred vision, impaired depth perception, vertigo, shortness

of breath, chest pain/with coughing, nausea, abdominal pain, difficulty with

concentration, memory problems, loss of coordination, and "pins and needles" in

toes. (Tr. 355). Dr. Jiang diagnosed Plaintiff with: memory lapses or loss status

post motor vehicle accident, cardiac arrest status post motor vehicle accident, a

likely anoxic brain injury, hemianopsia, right visual field loss, and a left occipital

injury. (Tr. 352). Dr. Jiang recommended a repeat MRI of the brain, visual field

evaluation and therapy, abstinence from driving, and cognitive therapy. (Tr. 352).

On June 11, 2011, Plaintiff was assigned a Global Assessment Function

("GAF")[7] of sixty (60) by Christine Kotlarski, LCSW. (Tr. 488).

---

7. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment
of a person's overall psychological, social and occupational functioning, in order
to assess the person's mental health illness. American Psychiatric Association
(2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.).
Washington, DC: Author. A GAF score is set within a particular range if either
the symptom severity or the level of functioning falls within that range. Id. The
score is useful in planning treatment and predicting outcomes. Id. The GAF
rating is the single value that best reflects the individual's overall functioning at
the time of examination. The rating, however, has two components: (1) symptom
severity and (2) social and occupational functioning. The GAF is within a
particular range if either the symptom severity or the social and occupational level
of functioning falls within that range. When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the worse of the two.
Thus, a suicidal patient who is gainfully employed would have a GAF rating
below 20. A GAF score of 21-30 represents behavior considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas. Id. A GAF score of 31-40 represents

On August 9, 2011, Plaintiff was seen at Yorktowne Family Medicine with complaints of left groin pain and discomfort in his incision area. (Tr. 438).  The doctor diagnosed chronic abdominal pain, left sutures in the abdominal scar, and chronic pain syndrome. (Tr. 438).

On August 18, 2011, Dr. Jiang noted that an MRI of Plaintiff's brain showed an old left occipital infarct, most likely secondary to anoxic brain injury, and diagnosed Plaintiff with hemianopsia, right visual field loss, and a left occipital injury.  (Tr. 410).  Dr. Jiang concluded that his visual field deficit could be permanent and referred him to neurophthalmology.  (Tr. 411).

---

some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Id.  Recently, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed.  Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16 (2013).  As a result, the SSA permits ALJs to use the GAF score as opinion evidence when analyzing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and the ALJ, therefore, should not "give controlling weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5 (July 13, 2013)

On August 23, 2011, presented to Christine Daecher, D.O. due to complaints of weakness and decreased energy, weight loss, weakness, fatigue, change of appetite, night sweats, loss of peripheral vision, abdominal pain, forgetfulness, confusion, vertigo, and paresthesia. (Tr. 368). Dr. Daecher noted that Plaintiff's gait was wide-based and slow, he had a depressed mood and flat affect, his head was atraumatic, his cervical spine, digits, shoulders, elbows, wrists, ankles, knees, and feet were benign, he maintained good posture and normal station, he maneuvered easily around the office, he got on and off the examination table and up and down from chairs with ease, he had no difficulty lying down and then sitting up, he had no difficulty putting on his shoes, and he was able to squat and stand back up without difficulty. (Tr. 369). Dr. Daecher diagnosed Plaintiff with general muscle weakness and noted that Plaintiff appeared to have post ICU syndrome and depression. (Tr. 369). She noted that "with this condition, a person has significant chronic muscle weakness and loss of energy and never returns to their baseline level if muscle function." (Tr. 369). Despite this diagnosis, Dr. Daecher opined that Plaintiff could: (1) occasionally lift and/ or carry fifty (50) pounds; (2) frequently lift and/ or carry two (2) to three (3) pounds; (3) walk three (3) to four (4) hours and sit four (4) to six (6) hours; (4) could engage in unlimited pushing and pulling within the lifting and carrying

14

weight limitations; and (5) could occasionally bend, kneel, stoop, crouch, balance, climb, and reach.  (Tr. 374-375).  She noted he had difficulty with feeling in his toes, heights, temperature extremes, and moving machinery.  (Tr. 375).

On October 20, 2011, Plaintiff underwent a mental status consultative examination performed by Thomas G. Bowers, Ph.D.  (Tr. 380).  Dr. Bowers noted Plaintiff's symptoms as awkward speech and word finding difficulty, pessimistic and resentful behavior, problematic sleep due to lack of consistent sleep with nightmares, hopelessness, poor appetite, sadness on a daily basis, crying spells, labile thought process, poor memory, impaired social judgment, and questionable insight.  (Tr. 380-381).  Dr. Bowers reported that Plaintiff's medical records noted problems in memory and visual field difficulties, which appeared to be secondary to a right-occipital region impairment, and remarked "this pattern of occipital blindness can correspond to specific neuropsychological deficits along the dimensions noted in his history."  (Tr. 382).  Dr. Bowers diagnosed Plaintiff with dementia due to anoxia, and assigned him a Global Assessment Function ("GAF") score of forty-five (45).  (Tr. 382).  Dr. Bowers concluded that Plaintiff's prognosis did not appear to be very favorable and "he may well have had some pre-existing dampening in his overall capacity and some pre[-]morbid problems in his functioning, which of course made much worse by his current circumstances."

(Tr. 382). Dr. Bowers opined that Plaintiff: did not demonstrate adequate capacity to manage funds; had moderate limitations in his ability to understand, remember, and carry out short, simple instructions, in his ability to interact appropriately with the public, supervisors, and co-workers, and in his ability to respond appropriately to changes in a routine work setting; and had marked limitations in his ability to make judgments on simple work-related decisions and to respond appropriately to work pressures in a usual work setting. (Tr. 383-384).

On November 9, 2011, Plaintiff was seen at Yorktowne Family Medicine with complaints of cough and abdominal pain. (Tr. 432). The doctor diagnosed abdominal wall pain due to sutures, upper respiratory infection, and a history of motor vehicle accident with right hemiopsia. (Tr. 432).

On November 10, 2011, Douglas Schiller, Ph.D., a state agency psychologist, noted that, for Impairment Listing purposes, Plaintiff had mild restrictions in his activities of daily living and moderate difficulties maintaining social functioning and with concentration, persistence, or pace. (Tr. 63, 78). He noted there was no evidence to support repeated episodes of decompensation, and that Plaintiff appeared to be able to meet the basic mental demands of substantial gainful activity. (Tr. 70, 85).

On November 10, 2011, Gregory Mortimer, M.D., a state agency physician,

16

completed a Physical Residual Functional Capacity Assessment form for Plaintiff. (Tr. 64-67, 79-82).  Dr. Mortimer opined that Plaintiff could: (1) lift and/ or carry twenty (20) pounds occasionally; (2) could frequently lift and/ or carry ten (10) pounds; (3) stand and/ or walk for two (2) hours and sit for about six (6) hours; (4) engage in unlimited in pushing and pulling within the aforementioned weight restrictions; (5) occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/ stairs; and (6) never climb ladders, ropes, or scaffolds.  (Tr. 64-65, 79-80). He also noted that Plaintiff had limited field of vision in his right eye, and that he should avoid concentrated exposure to vibration and even moderate exposure to hazards.  (Tr. 66-67, 81-82).

On December 12, 2011, during an ophthalmology evaluation, the doctor diagnosed a visual field defect consistent with stroke.  (Tr. 397).

On January 15, 2012, Plaintiff presented to the emergency room at Holy Spirit Hospital due to complaints of inflammation at the stitches site.  (Tr. 466). Plaintiff was diagnosed with doctor diagnosed suture irritation.  (Tr. 470).

On January 16, 2012, Plaintiff was treated for chronic abdominal wall pain due to swelling and pain at his surgical site.  (Tr. 426).

On February 15, 2012, Plaintiff underwent suture removal from his abdomen.  (Tr. 414).

On April 17, 2012, during a follow-up visit post-suture removal, Plaintiff complained of abdominal wall pain and increased anxiety and depression. (Tr. 420).

On May 9, 2012, Plaintiff presented to the emergency room at Holy Spirit Hospital with complaints of left lower quadrant pain and swelling and pain at surgical site in mid-abdominal area. (Tr. 452) An abdominal radiology report revealed an embedded surgical stitch in the inferior aspect of the scar adjacent to the umbilicus, with a probable surrounding foreign body granuloma. (Tr. 456). Plaintiff was diagnosed with acute abdominal pain. (Tr. 460).

On June 7, 2012, Plaintiff was seen at the emergency room at Carlisle Regional Medical Center with complaints of abdominal pain. (Tr. 474). Plaintiff was diagnosed with abdominal wall pain. (Tr. 474).

From June through July 2012, Plaintiff was treated at Sadler Health Center for adjustment disorder, severe abdominal pain, and areas of infection in his abdominal pain. (Tr. 484-492).

On December 13, 2012, Plaintiff presented to Pinnacle Health for a follow-up regarding his suture area and resultant pain. (Tr. 495). He noted he had pain at the incision site, and was diagnosed with incision pain. (Tr. 496-497).

On March 27, 2013, in an Employability Assessment Form dated March 27,

18

2013, Dr. Mpinga opined that Plaintiff was permanently disabled because of vision loss and anoxic brain injury. (Tr. 511).

On March 28, 2013, medical expert William Cirksena, M.D. testified at the oral hearing. (Tr. 44-50, 158-165). Dr. Cirksena acknowledged that Plaintiff had his spleen removed and his liver repaired, and that Plaintiff went into cardiac arrest as a result of the accident. (Tr. 45). He opined that Plaintiff's limitations were a result of the residual effects of these surgeries. (Tr. 45-47). Regarding Plaintiff's eye impairments, Dr. Cirksena noted that Plaintiff had not had an eye exam since December 12, 2011, at which Plaintiff was said to have 20/30 visual acuity in both eyes and a ninety percent (90%) visual acuity efficiency. (Tr. 46, 396). Dr. Cirksena reasoned that because the maps of Plaintiff's visual field did not show a visual field efficiency, Plaintiff had thirty-six percent (36%) efficiency in one eye and thirty-five percent (35%) efficiency in the other, and therefore Plaintiff did not meet the requirements of Impairment Listing 2.03. (Tr. 46, 396-400). Dr. Cirksena also noted that the surgical sutures could cause some pain, but did not believe that this was a severe impairment and also that the pain would not be great enough to warrant the constant prescribing and use of Oxycodone. (Tr. 45-49).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of June 30, 2011. (Tr. 12). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of January 28, 2011. (Tr. 12).

At step two, the ALJ determined that Plaintiff suffered from the severe[8]

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's

combination of impairments of the following: "residuals of surgery on abdomen (liver, splenectomy), hemianopsia of the right eye; anxiety (20 C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 12).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 12-14).

At step four, the ALJ determined that Plaintiff had the RFC  to perform sedentary work with limitations.  (Tr. 14-19).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that [Plaintiff] is limited to simple, routine and repetitive tasks in a work environment free from fast paced production involving only simple work related decisions with few, if any, work place changes and occasional supervision.  Additionally, the work must allow [Plaintiff] to sit or stand at will; must no involve more than occasional balancing, stooping, kneeling, crouching, crawling or climbing stairs; and must not involve climbing ladders.  Further, [Plaintiff] must avoid concentrated exposure to vibration, avoid moderate exposure to hazards, and is limited

---

ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

to occupations not requiring far acuity or peripheral vision.

(Tr. 14).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 19-21).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between January 28, 2011, the alleged onset date, and the date of the ALJ's decision. (Tr. 21).

## **DISCUSSION**

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred in not finding Plaintiff's anoxic brain injury to be a severe impairment; (2) substantial evidence does not support the ALJ's evaluation of the opinion evidence; (3) the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Plaintiff could perform; and (4) the ALJ's credibility finding is not based on substantial evidence. (Doc. 12, pp. 1-2, 12-29) . Defendant disputes these contentions. (Doc. 14).

1.    **Anoxic Brain Injury at Step Two**

Plaintiff argues that the ALJ erred in not finding Plaintiff's anoxic brain

injury to be a severe impairment at step two in violation of Social Security

Regulation ("SSR") 96-3p because this impairment was more than a slight

abnormality that had more than a minimal effect on his ability to do basic work

activities.  (Doc. 12, pp. 12-14).

SSR 96-3p states that an impairment is considered severe if it "significantly

limits an individual's physical or mental abilities to do basic work activities."

SSR 96-3p.  An impairment is not severe if it is a slight abnormality that has no

more than a minimal effect on the Plaintiff's ability to do basic work activities.  Id.

The United States Court of Appeals for the Third Circuit has held that as long as

the ALJ finds at least one (1) impairment to be severe at step two, that step is

resolved in Plaintiff favor, the sequential evaluation process therefore continues,

and any impairment that is found to non-severe is harmless error because the ALJ

still has to consider all impairments, both severe and non-severe, in the RFC

analysis.  See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); see also Salles v.

Commissioner of Social Security, 229 F. App'x 140, 145 n.2 (3d Cir. 2007)

("Because the ALJ found in [the plaintiff's] favor at Step Two, even if he had

erroneously concluded that some of her other impairments were non-severe, any

error was harmless." (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005))); Popp v. Astrue, 2009 U.S. Dist. LEXIS, *4 (W.D. Pa. April 7, 2009) ("The Step Two determination as to whether Plaintiff is suffering from a severe impairment is a threshold analysis requiring the showing of only one severe impairment . . . In other words, as long as a claim is not denied at Step Two, it is not generally necessary for the ALJ to have specifically found any additional alleged impairment to be severe.") (citations omitted).

The decisions rendered by the administrative law judges in the cases Plaintiff cites in his support of his argument, however, found none of the impairments in the respective cases to be severe, and ended the sequential evaluation process at Step Two, and thus, not in favor of the plaintiffs. See Baily v. Sullivan, 885 F.2d 52, 56-57 (3d Cir. 1987); Newell v. Commissioner of Social Security, 347 F.3d 541 (3d Cir. 2003); McCrea v. Commissioner of Social Security, 370 F.3d 357 (3d Cir. 2004). However, in the case at hand, the ALJ found several of Plaintiff's impairments to be severe at Step Two and thus resolved this step in Plaintiff's favor and continued the sequential evaluation process. (Tr. 12). The ALJ instead completed all five (5) steps of the sequential evaluation process, and in the RFC section, accounted for the limitations caused by Plaintiff's anoxic brain injury and the resulting visual field defects as the ALJ

limited Plaintiff to occupations that involved only simple, routine, and repetitive tasks in a work environment free from fast-paced production, to occupations that involved only simple work-related decisions with few, if any, workplace changes, to occupations with only occasional supervision, and to occupations that did not require peripheral vision or far acuity. (Tr. 14-20).  As such, because the sequential evaluation process continued past Step Two and because the ALJ took all of Plaintiff's impairments, both severe and non-severe, into account when determining his RFC, substantial evidence supports the ALJ's decision at Step Two, and the decision will not be disturbed on appeal based on this assertion.

### 2.   <u>Opinion Evidence</u>

Plaintiff argues that substantial evidence does not support the ALJ's evaluation of the opinion evidence. (Doc. 12, pp. 15-21).  More specifically, Plaintiff argues that: (1) the ALJ erred in assigning significant weight to Dr. Cirksena's opinion because he was a non-examining, non-treating source whose opinion was thus entitled to little if any weight and because he was an internal medicine doctor, not a psychologist, and therefore did not retain the expertise to render an opinion as to Plaintiff's mental health impairments and/ or limitations; (2) the ALJ erred in assigning significant weight to the opinion of Dr. Schiller, the state agency psychological consultant, and Dr. Mortimer, the state agency medical

consultant, because they were non-treating, non-examining sources and thus their opinions were entitled to little if any weight and were not supported by independent clinical findings; (3) the ALJ erroneously afforded limited weight to the opinion of Dr. Bowers, the consultative examiner, because the opinion should have been given greater weight under the principles of SSR 96-6p and precedent as the ALJ failed to identify any inconsistencies with the evidence of record and the decision was contradictory in his analysis that Dr. Bowers and Plaintiff lacked any patient/ doctor relationship; (4) the ALJ erred in assigning significant weight to the opinion of consultative examiner Dr. Ward on the ground that it was consistent with clinical findings and signs because the ALJ failed to explain why he included only some of the limitations in the RFC determination that were opined by Dr. Ward; and (5) the ALJ erred in assigning little weight to the opinion of Dr. Mpinga because he was a treating physician and because the ALJ should not have ignored his opinion as Dr. Mpinga was rendering a decision of disability on behalf of a governmental agency. (Doc. 12, pp. 15-21).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's

RFC determination that the plaintiff could perform light work, even though this

determination was based largely on the opinion of one medical expert, because the

medical expert's opinion was supported by the medical evidence of record);

Chandler v. Commissioner of Social Security, 667 F.3d 356, 361 (3d Cir. 2011)

("Although treating and examining physician opinions often deserve more weight

than the opinions of doctors who review records . . . '[t]he law is clear . . . that the opinion of a treating physician does not bing the ALJ on the issue of functional capacity' . . . state agent opinions merit significant considerations as well.") (citing Brown v. Astrue, 649, F.3d 193, 197 n.2 (3d Cir. 2011)); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

In examining the record and the ALJ's RFC analysis, this Court finds that substantial evidence upholds the weight the ALJ assigned to the medical opinion evidence. First and foremost, the ALJ provided sufficient and supported explanations as to why he was assigning great weight to the testimony and opinions of Dr. Cirksena, Dr. Schiller, and Dr. Mortimer. (Tr. 19-20). As discussed by the ALJ, these opinions were consistent with and supported by the objective and clinical findings. (Tr. 14-29). Simply because these opinions were rendered by state agency physicians who did not have a treating relationship with Plaintiff does not, as discussed in the aforementioned precedent, mean that the

ALJ could not give them significant weight, as he is the ultimate decision maker of Plaintiff's RFC.

Additionally, Plaintiff was incorrect in his assertion that Dr. Cirksena's testimony should not have been given great weight simply because he was an internal medicine doctor who had not practiced medicine since 2000 and was not an expert in psychology because the Third Circuit has already upheld that an administrative law judge may rely on the testimony of a medical expert who was an internist in order to assign less weight to the opinion of a treating source.  See Kerman v. Commissioner of Social Security, 134 S. Ct. 904 (2014).

Regarding the significant weight assigned to Dr. Ward's opinion, Plaintiff is incorrect in his assertion that the ALJ was bound to accept all the limitations as opined by Dr. Ward.  The United States Court of Appeals for the Third Circuit has held that "[N]o rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight.  On the contrary, the controlling regulations are clear that the RFC finding is a determination expressly reserved to the Commissioner."  Wilkinson v. Commissioner of Social Security, 558 F. App'x 254, 256 (3d Cir. 2012).

Regarding the opinions of Dr. Bower and Dr. Mpinga, the ALJ gave

sufficient explanation for giving these opinions limited weight.  The ALJ noted that Dr. Bower's opinion was inconsistent with the other evidence of record and that Dr. Mpinga's opinion that Plaintiff was permanently disabled was a conclusion lacking sufficient rationale. (Tr. 18-19).  It is noted that the ALJ is the ultimate decision maker as to Plaintiff's RFC, and because he has complied with the regulations and precedent and sufficiently provided an explanation for giving these opinions little weight, the ALJ did not err in the weight assigned to them. Simply because Plaintiff does not agree with the weight the ALJ assigned to all these opinions does not amount to an erroneous assignment of weight by the ALJ. As such, the ALJ's analysis of the opinion evidence in the RFC determination is supported by substantial evidence and will not be disturbed on appeal.

### 3.    Vocational Expert Hypotheticals and Testimony

Plaintiff also asserts that the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Plaintiff could perform. (Doc. 12, pp. 21-25).  More specifically, he asserts that the hypothetical the ALJ posed to the VE is not supported by substantial evidence because he included a sit/stand option without any specific time limitations, failed to include a limitation that Plaintiff required a cane to ambulate, and failed to include proper limitations regarding concentration, persistence, or pace in relation to his findings

at Steps Two and Three.  (Doc. 12, pp. 21-25).

Regarding the sit/stand option limitation the ALJ presented to the VE as one (1) of Plaintiff's limitations, Plaintiff is incorrect that the ALJ was in violation of SSR 96-6p, which requires "specificity as to the frequency and duration of [Plaintiff's] sit/ stand option so that the VE may properly make an assessment as to how significantly the restriction erodes the occupational base" because the sit/stand option was at will.  (Tr. 14-20).  This means that Plaintiff was able to sit and stand whenever he needed to, which clearly provides the VE with a specific frequency and duration with which Plaintiff would need to sit and/ or stand. Additionally, Plaintiff is incorrect that the ALJ erred in not including the cane limitation because, while Plaintiff testified that he used a cane and it was noted by Dr. Jiang that he used a cane, nowhere in the medical records does it note that Plaintiff was prescribed a cane.  It is within the ALJ's discretion to include in the RFC determination only the limitations he finds credible, and as long as the limitations included in the RFC determination are presented to the VE in the hypotheticals, the hypotheticals and VE's testimony are supported by substantial evidence.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (the hypotheticals an administrative law judge poses to a vocational expert need only include the impairments and limitations that are credibly established by the

record).  Furthermore, the ALJ limited Plaintiff to sedentary work, which allows Plaintiff to sit up to six (6) hours per day.  See SSR 83-10.  As such, Plaintiff's sit/stand option and cane arguments fail.

Regarding Plaintiff's assertion that the ALJ was required to specifically tell the VE, in the context of the hypothetical, that she had moderate difficulties in concentration, persistence, and pace, this argument is misguided.  The United States Court of Appeals for the Third Circuit held that "While [the plaintiff] focused upon the ALJ's broad finding of moderate difficulties at step two of the sequential evaluation, we give more attention to the substance of his overall review.  We want to know how well the ALJ studied the record, and how thoroughly he understood [the plaintiff's] specific impairments (or lack thereof) before making his decisions about her [RFC], and ultimately, her disability claim." Holley v. Commissioner of Social Security, 590 F. App'x 167, 168 (3d Cir. 2014) (the Third Circuit rejected the overly-broad reading of Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2002), that Plaintiff uses to support his argument).

In the case at hand, the ALJ studied and thoroughly outlined the record in his decision, proving that he thoroughly understood Plaintiff's specific impairments before decided his RFC.  (Tr. 7-20).  Furthermore, the ALJ limited Plaintiff in the area of concentration, persistence, and pace, as he stated,

"[Plaintiff] is limited to simple, routine and repetitive tasks in a work environment free from fast paced production involving only simple work related decisions with few, if any, work place changes and occasional supervision." (Tr. 14).

Additionally, in step five, the ALJ limited Plaintiff to only unskilled occupations, which are the least mentally strenuous type of work that includes limitations, including little specific vocational preparation, little to no judgment, and the ability to learn a job in thirty (30) days. See 20 C.F.R. §§ 404.1568(a), 416.968(a). As such, the ALJ's hypotheticals to the VE are supported by substantial evidence, Plaintiff's assertion that the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Plaintiff could perform is unsupported, and the appeal will not be disturbed on this argument.

### 4.    ALJ's Assessment of Plaintiff's Credibility

Lastly, Plaintiff argues that the ALJ's credibility finding is not based on substantial evidence. (Doc. 12, pp. 25-30). More specifically, Plaintiff asserts that the ALJ was incorrect in his statement that Plaintiff's "'allegations [were] unsupported by subjective and clinical findings, as well as his treatment and activities of daily living'" and that the ALJ failed to properly evaluate Plaintiff's testimony regarding the side effects his medications had on him, including

drowsiness and sleepiness.  (Id. at 26, 29) (citing (Tr. 15)).

As part of step four of the sequential evaluation process, once an ALJ concludes that there is a medical impairment that could reasonably cause the alleged symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)).  This "requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id.  In evaluating the intensity and persistence of a claimant's symptoms, an ALJ should consider (1) the claimant's history; (2) medical signs and laboratory findings; (3) medical opinions; and (4) statements from the claimant, treating and non-treating sources, and other persons about how the claimant's symptoms affect him/her. See 20 C.F.R. § 404.1529.  Importantly, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  1996 SSR LEXIS 4 (1996); 20 C.F.R. § 404.1529(c)(2).

"Generally, 'an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged

with the duty of observing a witness's demeanor and credibility.'" Fell v. Astrue,

2013 U.S. Dist. LEXIS 167100, *29 (M.D. Pa. 2013) (Conaboy, J.) (quoting

Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997));

Frazier v. Apfel, 2000 U.S. Dist. LEXIS 3105 (E.D. Pa. Mar. 6, 2000). "'The

credibility determinations of an administrative judge are virtually unreviewable on

appeal." Hoyman v. Colvin, 606 Fed. App'x 678, 681 (3d Cir. 2015) (citing

Beiber v. Dep't of the Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).

Social Security Ruling 96-7p gives the following instructions in evaluating

the credibility of the claimant's statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p. "In particular, an ALJ should consider the following factors: (1) the

plaintiff's daily activities; (2) the duration, frequency and intensity of the

plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication taken to alleviate the

symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any

measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's

prior work record; and (8) the plaintiff's demeanor during the hearing." Jury v.

Colvin, 2014 U.S. Dist. LEXIS 33067, *33 (M.D. Pa. 2014) (Conner, J.) (citing 20

C.F.R. § 404.1529(c)(3)).

In assessing Plaintiff's credibility in this case, the ALJ stated:

> After careful consideration of the evidence, the undersigned
> finds that [Plaintiff's] medically determinable impairments
> could reasonably be expected to cause the alleged symptoms;
> however, [Plaintiff's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> entirely credible for the reasons explained in this decision.
> .......................................................................................
>
> While [Plaintiff's] complaints are extensive, his allegations are
> unsupported by objective and clinical findings, as well as his
> treatment and activities of daily living.

(Tr. 15).  The ALJ discussed the medical record highlights in support of his

credibility determination: (1) Plaintiff had 20/30 vision in both eyes and visual

acuity efficiency of ninety percent (90%); (2) there was "no evidence in the MRI

that the areas of the brain which control memory and concentration were

affected;" and (3) while Plaintiff's sutures could cause pain, the pain would not be

enough to necessitate narcotic pain medication.  (Tr. 16-17).  In terms of

Plaintiff's activities of daily living, the ALJ noted that Plaintiff testified that he

was able to read, watch television, listen to the radio, spend time with his family, use the computer, keep current with business news, count change, bathe and dress himself, pay bills, use a checkbook, understand and follow instructions, and deal with stress and change without problems. (Tr. 17). Thus, the ALJ considered the aforementioned Jury factors in his analysis, including daily activities, treatment and measures used to relieve symptoms, and the duration, frequency and intensity of Plaintiff's symptoms, which is evident in the resulting restrictive RFC finding. While Plaintiff is correct that his capacity to engage in some limited activities of daily living for brief periods of time is not evidence that he can perform the requirements of substantial gainful activity, the ALJ can still consider daily activities in determining Plaintiff's credibility and the degree to which self-reported pain and limitations can be accepted as true. See SSR 96-7p; Jury v. Colvin, 2014 U.S. Dist. LEXIS 33067 at *33.F

Upon review of the record and the ALJ's credibility determination, it is determined that there is substantial evidence to support the ALJ's credibility finding of Plaintiff. The ALJ is correct that there were enough inconsistencies in the record regarding Plaintiff's self-reported limitations that weakened his credibility. Furthermore, the ALJ did not find Plaintiff to be not credible, but only not entirely credible. (Tr. 15). The restrictive RFC finding is evidence that ALJ

found Plaintiff credible to some degree, albeit not completely, as the ALJ

concluded Plaintiff could perform only a limited range of sedentary work based, in

part, on his subjective complaints.  (Tr. 14-20).  As such, because the ALJ's

credibility determination is to be accorded great deference and is supported by

substantial evidence, the ALJ's decision will not be disturbed on appeal based on

Plaintiff's assertion.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined

that the Commissioner's decision is supported by substantial evidence.  Therefore,

pursuant to 42 U.S.C. § 405(g), the appeal will be denied and the decision of the

Commissioner will be affirmed.

A separate Order will be issued.

**Date**: March 17, 2016

/s/ **William J. Nealon**
**United States District Judge**